# EXHIBIT 1

**STUEMKE LAW FIRM PLLC**
Jay E. Stuemke, Esq., (HI SBN 011696): jay@stuemkelaw.com
142 Kuailima Drive Ste. A
Kailua, Hawaiʻi 96734
Telephone: (808) 460-3161
Facsimile: (808) 460-3163

**BRIDGFORD, GLEASON & ARTINIAN**
Richard K. Bridgford, Esq., (CA SBN 119554): Richard.bridgford@bridgfordlaw.com
Michael H. Artinian, Esq., (CA SBN 203443): mike.artinian@bridgfordlaw.com
Allan L. Bridgford, Esq., (CA SBN 327125): ab@bridgfordlaw.com
Brian E. Sutter, Esq., (CA SBN 333107): brian.sutter@bridgfordlaw.com
Talia R. Edri, Esq., (CA SBN 339244): talia.edri@bridgfordlaw.com
*Pro Hac Vice Applications Forthcoming*
26 Corporate Plaza Dr., Suite 250
Newport Beach, CA 92660
Telephone:  (949) 831-6611
Facsimile:  (949) 831-6622

**Electronically Filed**
**SECOND CIRCUIT**
**2CCV-23-0000243**
**29-AUG-2023**
**10:22 AM**
**Dkt. 1 CMPS**

*Attorneys for Plaintiffs*

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAIʻI

| | |
|---|---|
| AINA KOHLER;<br>JONATHAN VARONA;<br>K1 VARONA, a minor by and through their<br>Guardian ad Litem AINA KOHLER;<br>K2 VARONA, a minor by and through their<br>Guardian ad Litem AINA KOHLER;<br>LAHAINA SURF SHACK, LLC;<br>KEIKI BOWLS, LLC;<br>REBECCA LAURICELLA;<br>MELE BINTLIFF;<br>SCOTT BINTLIFF;<br>C. BINTLIFF, a minor by and through their<br>Guardian ad Litem MELE BINTLIFF;<br>MICHAEL BECKER, individually and as<br>Trustee of the MICHAEL AND SUSAN<br>BECKER FAMILY TRUST;<br>SUSAN BECKER, individually and as Trustee<br>of the MICHAEL AND SUSAN BECKER<br>FAMILY TRUST; | CIVIL CASE NO.<br>(Other Non-Vehicle Tort)<br><br>**COMPLAINT FOR DAMAGES:**<br><br>  1. **NEGLIGENCE**<br>  2. **GROSS NEGLIGENCE**<br>  3. **ULTRAHAZARDOUS**<br>     **ACTIVITY**<br>  4. **TRESPASS**<br>  5. **PREMISES LIABILITY**<br>  6. **PRIVATE NUISANCE**<br>  7. **PUBLIC NUISANCE**<br><br>**JURY TRIAL REQUEST: DAMAGES**<br>**EXCEED $150,000** |

1

I do hereby certify that the foregoing is a full, true and correct copy of the official court record of the Courts of the State of Hawaiʻi.
Dated at: Wailuku, Hawaiʻi 30-AUG-2023, /s/ Sandy S. Kozaki, Clerk of the Second Judicial Circuit, State of Hawaiʻi



EDWARD O'MARA;
MIKEY MONTOYA;
Z. O'MARA, a minor by and through their
Guardian ad Litem EDWARD O'MARA;
B. O'MARA, a minor by and through their
Guardian ad Litem EDWARD O'MARA,

        Plaintiffs,

vs.

HAWAIIAN ELECTRIC INDUSTRIES, INC.,
a Hawai'i corporation; HAWAIIAN
ELECTRIC COMPANY, INC., a Hawai'i
corporation; HAWAI'I ELECTRIC LIGHT
COMPANY, INC., a Hawai'i Corporation;
MAUI ELECTRIC COMPANY, LIMITED, a
Hawai'i corporation; and DOES 1 through 100,
inclusive,

        Defendants.

Plaintiffs AINA KOHLER; JONATHAN VARONA; K1 VARONA, a minor by and through their Guardian ad Litem AINA KOHLER; K2 VARONA, a minor by and through their Guardian ad Litem AINA KOHLER; LAHAINA SURF SHACK, LLC; KEIKI BOWLS, LLC; REBECCA LAURICELLA; MELE BINTLIFF; SCOTT BINTLIFF; C. BINTLIFF, a minor by and through their Guardian ad Litem MELE BINTLIFF; MICHAEL BECKER, individually and as Trustee of the MICHAEL AND SUSAN BECKER FAMILY TRUST; SUSAN BECKER individually and as Trustee of the MICHAEL AND SUSAN BECKER FAMILY TRUST; EDWARD O'MARA; MIKEY MONTOYA; Z. O'MARA, a minor by and through their Guardian ad Litem EDWARD O'MARA; and B. O'MARA, a minor by and through their Guardian ad Litem EDWARD O'MARA; (hereinafter "Plaintiffs"), by and through their attorneys, hereby allege, on information and belief, as follows:

2

## INTRODUCTION

1.      This case arises from the Lahaina Fire, a fire caused by HAWAIIAN ELECTRIC's power lines, which began on or around August 8, 2023, located in the town of Lahaina, in the County of Maui, Hawai'i.

2.      According to the County of Maui, as of August 23, 2023, the Lahaina Fire killed at least 115 people, destroyed or damaged at least 2,142 structures[1], and burned an estimated 2,170 acres.[2] More than approximately 9,800 people have been displaced as a result of the fire.[3] As of August 21, 2023, approximately 388 people remain missing despite 95% of the disaster site having been searched, according to Maui County officials.[4]

3.      The Lahaina Fire ranks as the fifth deadliest wildfire in United States history and the deadliest in the last 100 years.[5] These shocking statistics and rankings notwithstanding, the losses to the people of Lahaina and Maui are nearly immeasurable.

4.      Among the cultural losses in Lahaina, the former capital of the Hawaiian Kingdom, were the 200-year-old Waiola Church and Cemetery, where many residents were baptized, married, and buried; the Lahaina Jodo Mission, a 90-year-old temple belonging to the Hongwanji Shin Buddhist community on Maui; the immersion school Pūnana Leo which educated local children in Hawaiian language and culture; the Old Lahaina Courthouse, opened

---

[1] Chani Goering, *Data collection and mapping efforts support the County of Maui's wildfire response, search and recovery*, PACIFIC DISASTER CENTER (Aug. 17 2023), https://www.pdc.org/data-collection-mapping-search-recovery-maui-wildfire-response/.
[2] *8/21 County of Maui Wildfire Disaster Update*, CNTY. OF MAUI (Aug. 21, 2023), https://www.mauicounty.gov/CivicAlerts.aspx?AID=12744.
[3] *Supra* note 1.
[4] *County of Maui releases validated list of names of individuals who remain unaccounted for following*, CNTY. OF MAUI (Aug. 24, 2023), https://www.mauicounty.gov/CivicAlerts.aspx?AID=12763#:~:text=The%20County%20of%20Maui%20on,who%20can%20be%20accounted%20for.
[5] Rachel Treisman, *Maui's wildfires are among the deadliest on record in the U.S. Here are some others*, NATIONAL PUBLIC RADIO (Aug. 15, 2023), https://www.npr.org/2023/08/15/1193710165/maui-wildfires-deadliest-us-history.

in 1860 as a customs house for whaling and trade ships until the 1970s where it served as a

courthouse, police station, and post office; and the last native Hawaiian kingdom flag to fly over

Lahaina in 1898, all now razed to ash.[6]

5. A map of the burn scar taken by the National Aeronautics and Space

Administration's ("NASA") Copernicus Sentinel 2 satellite on August 14, 2023, depicts the path

of the devastating Lahaina Fire took.[7]



6. The impact of the Lahaina Fire is widespread, requiring the involvement of local,

State, Federal, and non-governmental entities and resources, including Maui County, the Maui

---

[6] *See* Sakshi Venkatraman, *After Hawaii fires scorch historic church and school, Lahaina mourns loss of culture*, NBC NEWS (Aug. 10, 2023), https://www.nbcnews.com/news/asian-america/hawaii-fires-scorch-historic-church-school-lahaina-mourns-loss-culture-rcna99198; *see also* Olivia Waxman, *The History Lost in the Maui Wildfires*, TIME (Aug. 15, 2023), https://time.com/6305270/maui-wildfire-history-museums-artifacts-lost/.
[7] *Copernicus Sentinel-2 Products for the August 2023 Hawaiʻi Wildfires*, NATIONAL AERONAUTICS AND SPACE ADMINISTRATION (Aug. 14, 2023), https://maps.disasters.nasa.gov/arcgis/home/item.html?id=49ae19ae07dc439ab8fe755627079282.

4

Fire Department (hereinafter "MFD"), the Maui Emergency Management Agency (hereinafter "MEMA"), the Hawaiʻi Emergency Management Agency (hereinafter "HEMA"), the Federal Emergency Management Agency (hereinafter "FEMA"), the United States Coast Guard, United States Navy Third Fleet, the United States Army's 25th Combat Aviation Brigade, and the National Guard.[8]

7.     The Maui County Fire Department firefighters first began combatting the Lahaina Fire as of August 8, 2023, around 6:40 a.m. Hawaiian Standard Time ("HST") (all times mentioned in this complaint are based on HST) and continued fighting the fire until at least August 13th.

8.     Investigations into the cause and origin of the Lahaina Fire are currently underway and ongoing, including those by the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"), Maui County Fire Officials, and other local partners.[9]

9.     In an August 27, 2023, press release, HAWAIIAN ELECTRIC admitted that "A fire at 6:30 a.m. (the "Morning Fire") appears to have been caused by power lines that fell in high winds."[10] HAWAIIAN ELECTRIC stated the obvious in its press release: downed power lines ignited the Lahaina Fire around 6:30 a.m. on August 8, 2023. Eyewitness accounts and videos from August 8th confirm that the Lahaina Fire burned down this same slope throughout the day, in an area where HAWAIIAN ELECTRIC exclusively owned, operated, controlled, and maintained all the distribution and transmission power lines and power poles.

---

[8] Joseph Clark, *DOD Mobilizes Support in Response to Hawaii Wildfire*, U.S. DEPT. OF DEFENSE (Aug. 10, 2023), https://www.defense.gov/News/News-Stories/Article/Article/3490306/dod-mobilizes-support-in-response-to-hawaii-wildfire/.
[9] *ATF National Response Team Joins Hawaii Wildfire Inquiry*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (Aug. 17, 2023), https://www.atf.gov/news/pr/atf-national-response-team-joins-hawaii-wildfire-inquiry.
[10] *Hawaiian Electric provides update on Lahaina fires, response*, HAWAIIAN ELECTRIC CO. (Aug. 27, 2023), https://www.hawaiianelectric.com/hawaiian-electric-provides-update-on-lahaina-fires-response.

10.     After the Lahaina Fire, HAWAIIAN ELECTRIC removed damaged power poles and other equipment from the likely origin area of the Lahaina Fire, hauling away fallen power poles, power lines, transformers, conductors, and other equipment near the Lahaina Substation around August 12, 2023, before investigators from ATF arrived on scene.[11]

11.     Upon information and belief, Plaintiffs allege that Defendants are the substantial cause of the Lahaina Fire.

12.     In the days leading up to Tuesday August 8, 2023, multiple weather reports warned of high winds and low humidity due to Hurricane Dora passing about 700 miles south of the island of Maui. The National Weather Service ("NWS") posted on X on August 6, 2023, "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it & the high pressure to the north creates a threat of damaging winds & fire weather (due to ongoing dry conditions) from early Mon to Wed."[12] Additionally, NWS warned, "Strongest winds in yellows & oranges on map result from significant pressure differences between high & low-pressures. Combined w/ dry conditions, these winds pose a serious fire & damaging wind threat. Stay alert! 🔥☁️."[13]

13.     On August 8, 2023, at 12:27 p.m., NWS in Honolulu issued a red flag and high wind warning stating "🔥 Red Flag: High fire danger with rapid spread. NO outdoor burning."[14]

---

[11] Brianna Sacks and Allyson Chiu, *Maui utility may have compromised evidence in fire probe, lawyers say*, WASH. POST (Aug. 24, 2023), https://www.washingtonpost.com/climate-environment/2023/08/24/maui-fires-power-utility-lahaina-investigation/.
[12] @NWSHonolulu, NAT'L WEATHER SERV., HONOLULU, X (Aug. 6, 2023), https://twitter.com/NWSHonolulu/status/1688339741685792768.
[13] *Id.*
[14] @NWSHonolulu, NAT'L WEATHER SERV., HONOLULU, X (Aug. 8, 2023), https://twitter.com/NWSHonolulu/status/1689040628599136256.

14.     In addition to the forecast for high winds, 83 percent of Maui showed signs of abnormally dry, moderate or severe drought according to the U.S. Drought Monitor, with Lahaina in a zone of moderate drought.[15] Jason Otkin, an atmospheric scientist at the University of Wisconsin, Madison, found that Maui experienced a two-category increase in drought severity in just three weeks from May to June, with that rapid intensification fitting the definition of a flash drought.[16] Moreover, he said, "The most destructive fires usually occur during drought. If an area falls into drought quickly, that means there is a longer window of time for fires to occur. The risk for destructive fires could increase in the future if flash droughts become more common, as some studies have indicated."[17]

15.     On August 7, 2023, the National Weather Service recorded wind gusts on the island of Maui of 49 and 58 miles per hour, and a 53 miles per hour gust recorded at 7:10 am on August 8th.[18]

16.     On August 7, 2023, at approximately 10:47 p.m. security camera footage from the Maui Bird Conservation Center (hereinafter "MBCC"), located at 2375 Olinda Road, Makawao, Hawai'i 96768, recorded an electrical arc flash, shortly before the MBCC lost power.[19]

---

[15] Claire Rush, Seth Borenstein, and Jennifer McDermott, *Maui's fire became deadly fast. Climate change, flash drought, invasive grass and more fueled it*, AP NEWS (Aug. 10, 2023), https://apnews.com/article/hawaii-wildfires-climate-change-92c0930be7c28ec9ac71392a83c87582.
[16] *Id.*
[17] *Id.*
[18] *Summary of Peak Wind Gusts - August 7-9, 2023*, NAT'L WEATHER SERV., https://www.weather.gov/hfo/windSummary20230809.
[19] *How the deadly wildfires took over Maui hour by hour*, ABC NEWS (Aug. 18, 2023), https://www.youtube.com/watch?v=OhvdKAiKmo8&t=154s; *see also* @hawaiidlnr, *Olinda Fire footage captured by Maui Bird Conservation Center (MBCC) security camera. Jennifer Pribble, MBCC Senior Research Coordinator*, INSTAGRAM (Aug. 11, 2023), https://www.instagram.com/reel/Cv1GIK8g1Ie/?igshid=MzRlODBiNWFlZA%3D%3D.



17.     At that exact moment, sensors in the nearby Maui County town of Makawao

recorded a significant incident in HAWAIIAN ELECTRIC's grid, according to data from

Whisker Labs, a company that uses an advanced sensor network to monitor grids across the

United States.[20]

---

[20] Brianna Sacks, *Powerlines likely caused Maui's first reported fire, video and data show*, WASH. POST (Aug. 16, 2023), https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/.

18.     Once the emergency power generator at the MBCC facility turned on, the security camera there turned on and recorded the incipient stages of what would become the Olinda Fire at 10:51 p.m. on August 7, 2023.[21]



19.     Satellite imagery and roadside imagery taken from Google Earth confirms that electric distribution lines traverse the forest across the street from MBCC, less than 100 yards away.

---

[21] *Id.*





10

20.     Whisker Labs sensors detected two significant faults in the power grid in the town of Lahaina at 2:44 a.m. and 3:30 a.m. on Tuesday, August 8, 2023.[22]

21.     Around 3:00 a.m. a young woman named La'i awoke in her family home near Lahainaluna Road in Lahaina to a bright flash outside her second story window coming from the power poles and HAWAIIAN ELECTRIC's Lahaina Substation located right up the hill from her home. La'i remarked how she couldn't believe how strong the winds sounded when she woke up.[23]

22.     According to data recorded by Whisker Labs, 34 faults occurred in Lahaina between August 7th at 11:38 p.m. until 5 a.m. August 8th, indicating immense stress on the local grid for a prolonged period of time.[24]

23.     At 5:10 a.m. HAWAIIAN ELECTRIC's Maui County Outage Map recorded an outage that affected 1,000 customers located near the intersection of Honoapi'ilani Highway and Kenui Street, a post HAWAIIAN ELECTRIC have since taken down.[25] The following screen capture of HAWAIIAN ELECTRIC's Outage Map webpage shows an outage occurring at 5:10 a.m. on August 8, 2023, in Lahaina. This screen capture was taken before HAWAIIAN ELECTRIC took down their online Maui County Outage Map.[26]

---

[22] *Supra* note 20.
[23] *Id.*
[24] *Id.*
[25] *Supra* note 19.
[26] *Maui County Outage Map*, HAWAIIAN ELEC. CO. INC., (last accessed Aug. 23, 2023, 3:44 am HST) https://www.hawaiianelectric.com/safety-and-outages/power-outages/maui-county-outage-map.

11



24.     In their August 27, 2023, press release, HAWAIIAN ELECTRIC stated that "A fire at 6:30 a.m. (the "Morning Fire") appears to have been caused by power lines that fell in high winds."[27]

25.     According to the County of Maui, a brush fire was reported at 6:37 a.m. in the area of Lahainaluna Road in the town of Lahaina on the morning of August 8, 2023 (hereinafter and throughout "the Lahaina Fire").[28]

26.     At 6:39 a.m. Whisker Labs, stopped receiving any data from its electric sensor in Lahaina.[29]

---

[27] *Supra* note 10 at p.1.
[28] @County of Maui, FACEBOOK (Aug, 8, 2023 at 10:05 a.m.),
https://www.facebook.com/countyofmaui/posts/pfbid0vkAdF9mMZi5tmPbuARNVywhxECaaLN1JXztHpEG9ZM
Ty7wVX8Fo8N6LbCAEVRHFil.
[29] *Supra* note 20.

27.     At 6:40 a.m., Lahaina resident Shane Treu live streamed three videos on Facebook looking toward Lahainaluna Road approximately 100 yards south of Lahaina Intermediate School located at 871 Lahainaluna Rd, Lahaina, Hawai'i 96761 ("GENERAL AREA OF ORIGIN"), depicting downed power lines and fire igniting beneath those said lines.[30] In his first video Treu states, "This is live right across the street from my house. Fricken power line just went down."[31] Within minutes, the fire races past Treu's house, carrying embers far downhill.[32]

28.     Fire is visible in Treu's video across Lahainaluna Road underneath distribution lines and/or transmission lines leading away from HAWAIIAN ELECTRIC's Lahaina Substation, on the other side of a fence line.[33] Additionally, a downed energized power line is also seen igniting grass on the road verge between Lahainaluna Road and its adjacent sidewalk.[34]

---

[30] *See* @Shane Treu, FACEBOOK (Aug. 8, 2023, 6:40 a.m.), https://www.facebook.com/shane.treu.1/videos/181854484802153; @Shane Treu, FACEBOOK (Aug. 8, 2023, 6:43 a.m.), https://www.facebook.com/shane.treu.1/videos/1155186158798755; @Shane Treu, FACEBOOK (Aug. 8, 2023, 6:57 a.m.), https://www.facebook.com/shane.treu.1/videos/672743984714116.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

13



29.    Post-fire satellite imagery taken on August 12, 2023, depicts the burn scar this

brush fire left near Lahainaluna Road.[35] The burn scar leads downslope from the Lahaina

Substation in a southwesterly direction toward downtown Lahaina, the same direction high

winds blew through Lahaina that morning. This post-fire satellite imagery confirms that the burn

scar is continuous with no gaps from the Lahaina Substation all the way past Kuialua Street

down to Lahaina Bypass and the rest of Lahaina, indicating that this is the path of *one* fire.

---

[35] GOOGLE EARTH, (Satellite Imagery taken on Aug. 12, 2023)
https://earth.google.com/web/search/lahainaluna+road+/@20.88428715,-
156.6648834,87.09995157a,1873.05986642d,35y,61.02228878h,11.99209867t,0r/data=CnwaUhJMCiUweDc5NTU
yYmFkYTMwYWRmMTc6MHg4MWFjYTFkZTE4NTk3MjY2GXXznhT34TRAIbUmJyRjlWPAKhFsYWhhaW
5hbHVuYSByb2FkIBgBIAEiJgokCaWhKd6BwkBAEZb8zEA6wkBAGfHii1pTb13AIWe-KUCDb13A.



30.     A photograph taken by Stephen Lam of the San Francisco Chronicle depicts the

HAWAIIAN ELECTRIC power poles near the Lahaina Substation that were depicted in Shane

Treu's August 8th video, in the middle of the burn scar after the fire.[36]

---

[36] Matthias Gafni, *New Maui fire controversy: Witnesses say firefighters let Lahaina blaze restart and spread*, S.F. CHRON. (Aug. 17, 2023), https://www.sfchronicle.com/climate/article/lahaina-fire-start-controversy-18300089.php.



31.     At approximately 6:45 a.m., Lahaina resident Dominga Advincula prepared to leave her home near Kuialua Street, just over a hundred yards south of where Shane Treu recorded the video of the brush fire on Lahainaluna Road, to head to work when she heard a loud boom outside. She ran outside and spotted the source of the explosion: a blown transformer raining sparks onto the dry Lahaina hillside.[37]

32.     At 10:05 a.m., the County of Maui posted on its Facebook page that the brush fire reported at 6:37 a.m. near Lahainaluna Road was "[f]ueled by strong winds from Hurricane Dora that is passing well south of Hawai'i." At that time, the County indicated that the "Maui Fire Department declared the Lahaina brush fire 100% contained shortly before 9 a.m. today" but also that "power outages are impacting the ability to pump water, and the public is asked to conserve water in West Maui" and that "[w]inds in the area remain a concern. A high-wind warning issued

---

[37] *See id.*

by the National Weather Service for portions of Maui County remains in effect through 6 a.m. Wednesday."[38]

33.     Around 10:00 a.m., Lahaina resident Dominga Advincula watched firefighters spray water onto hot spots on the hillside near Lahainaluna Road. She watched the firefighters leave the site of the fire between 1:00 p.m. and 2:00 p.m. Within an hour of the last fire truck leaving, Advincula observed smoke behind her neighbor's house and decided to evacuate for the second time.[39]

34.     A spokesperson for Maui Fire Department said that crews had cleared the blaze around 12:45 p.m., with engines leaving at 12:47 p.m. to respond to two other fires burning on the island demanding their attention.[40]

35.     At 12:28 p.m. HAWAIIAN ELECTRIC's Maui County X account posted, "925a #MauiOutage update: Crews are still working to safely restore power to several thousand customers in West Maui and parts of Upcountry who lost power due to high winds. There are several spans of downed power lines in various areas that need repairs. Mahalo for your patience."[41] HAWAIIAN ELECTRIC also posted photographs of downed and damaged power poles and power lines in Lahaina to accompany the quoted text above.

---

[38] @County of Maui, FACEBOOK (Aug. 8, 2023 at 10:05 a.m. HST),
https://www.facebook.com/countyofmaui/posts/pfbid0vkAdF9mMZi5tmPbuARNVywhxECaaLN1JXztHpEG9ZM
Ty7wVX8Fo8N6LbCAEVRHFil.
[39] *Supra* note 36.
[40] Brianna Sacks and Allyson Chiu, *Maui utility may have compromised evidence in fire probe, lawyers say*, WASH.
POST (Aug. 24, 2023), https://www.washingtonpost.com/climate-environment/2023/08/24/maui-fires-power-utility-
lahaina-investigation/.
[41] @MauiElectric, HAWAIIAN ELECTRIC – MAUI COUNTY, X (Aug. 8, 2023),
https://twitter.com/MauiElectric/status/1688995644470411265.

 

36.     Around 2:30 p.m., Lahaina resident Mark Stefl observed flames a few hundred yards away on the hillside across from his home located near the intersection of Kalena Street and Lahainaluna Road, about 0.75 miles down the hill from HAWAIIAN ELECTRIC's Lahaina Substation.[42] Stefl recounted that "Within minutes, there was a wall of fire 30 yards from the house."[43]

37.     Shortly before 3:00 p.m., HAWAIIAN ELECTRIC emergency crews "saw a small fire about 75 yards away from Lahainaluna Road in the field near the Intermediate School."[44] Post-fire satellite imagery from Google Earth shows that the area HAWAIIAN

---

[42] Josh Partlow, John Farrel, Brady Dennis, Brianna Sacks, and Joanna Slater, *How the Maui wildfires devastated Lahaina, hour by hour*, WASH. POST (Aug. 13, 2023), https://www.washingtonpost.com/climate-environment/2023/08/13/maui-wildfire-started-spread/.
[43] *Id.*
[44] *Supra* note 10 at p.2.

ELECTRIC crew members say they observed the fire in the afternoon falls within the

GENERAL AREA OF ORIGIN of the Lahaina Fire that started at or around 6:30 a.m.[45]



38.     Dry winds continued to rage on the island of Maui at this time, as the National

Weather Service recorded a wind gust of 53 miles per hour at 1:20 p.m. at its Kealia Pond

weather station and a wind gust of 47 miles per hour at its Molokai 1 weather station at 2:37

p.m.[46]

39.     At 3:30 p.m., Maui County officials closed the Lahaina Bypass due to a flare up

of the Lahaina Fire. Officials also began evacuation orders sometime later in the vicinities of

---

[45] *Supra* note 35.

[46] *Summary of Peak Wind Gusts - August 7-9, 2023*, Nat'l Weather Serv. (Aug. 9, 2023),
https://www.weather.gov/hfo/windSummary20230809.

Lahainaluna Road, Hale Mahaolu, and Lahaina Bypass. At the time of the Maui County update

at 4:45 p.m., officials stated that Lahaina Bypass was closed, and other roads were closed

including Honoapiʻilani Highway—the only other major highway leaving Lahaina to the south—

all the way to Hokiokio Place 1.5 miles away. [47]

  40.  At 3:41 p.m. Lahaina Resident Joe Schilling sent a text message to a friend

("Multiple houses on fire right across from me can't leave can't see") from his residence at Hale

Mahaolu Eono, a senior living center located near Lahainaluna Road at 810 Kelawea Street,

Lahaina, Hawaiʻi 96761. Between 3:51 p.m. and 3:54 p.m., Schilling texted his friend that he's

in a unit with six others and stated, "We are trapped can't see a thing plus when u try to breath it

burns ur lungs." At 3:57 p.m. Schilling texted a photograph of a house burning near him.[48]



  41.  At 3:50 p.m., the Lahaina Fire, which started near HAWAIIAN ELECTRIC's

Lahaina Substation earlier that morning, entered residential areas in Lahaina and began burning

---

[47] *Lahaina fire flareup forces Lahaina Bypass road closure; shelter in place encouraged*, CNTY. OF MAUI (Aug. 8, 2023), https://www.mauicounty.gov/CivicAlerts.aspx?AID=12632.
[48] *Supra* note 19.

structures down, as indicated by Joe Schilling's photograph that he sent to his friend—among the last messages he likely ever sent. Schilling's family believes that he died in the Lahaina Fire trying to save others in the senior center.[49]

42.     Around 4:00 p.m., Lahaina resident Cole Millington and his roommate Caitlin Carroll tried to evacuate Lahaina via Honoapiʻilani Highway in heavy traffic and discovered HAWAIIAN ELECTRIC workers clearing downed power poles and power lines on the highway and, apparently, attempting to install new power poles, blocking lanes of traffic.[50]



43.     Meanwhile Lahaina resident Zero Campbell evacuated from his home on Lahainaluna Road around 3:30 p.m.—watching it burn in his rearview mirror. As he evacuated,

---

[49] Peter Charalambous, *'Helping others up to the very end': Family believes missing Lahaina man likely died trying to help neighbors*, ABC NEWS (Aug. 17, 2023), https://abcnews.go.com/US/helping-end-family-believes-lahaina-man-died-save/story?id=102256601.
[50] Alicia Victoria Lozano, Phil McCausland, and Cory Siemaszko, *Maui residents say utility trucks blocked roads as they tried to flee*, NBC NEWS, (Aug. 16, 2023), https://www.nbcnews.com/news/us-news/maui-residents-say-utility-trucks-blocked-roads-tried-flee-rcna100200.

he encountered multiple road closures throughout Lahaina due in part to HAWAIIAN

ELECTRIC's downed power poles and power lines. Police directed him west to Front Street. At

4:34 p.m. he encountered bumper-to-bumper traffic on Front Street surrounded in pitch-black

darkness created by smoke from the Lahaina Fire.[51] After 90 minutes, Campbell escaped; he later

said, "Probably the only reason why I'm still around is I got a head start."[52]



44.     Others who sought to evacuate via Front Street were not so lucky. Lahaina

resident Ydriss Nouara tried to evacuate Lahaina around 3:00 pm but stated that he couldn't get

to Prison Street in Lahaina because of a downed power line in the street. Nouara made it to Front

Street and described what he experienced in an interview with the New York Times,

---

[51] Matthias Gafni, *Life and death on Front Street: The harrowing final moments as flames overtook Lahaina*, S.F. CHRON. (Aug. 16, 2023), https://www.sfchronicle.com/climate/article/maui-fire-lahaina-harrowing-moments-18293381.php.
[52] *Id.*

[O]n Front Street, that was just chaos. I could hear screams. And then I couldn't see people, but I could hear them scream. Scary screams. Screams of pain I've never heard before. They were clearly people burning alive. Like, it was a deep pain and people were throwing up. And it was just horrifying. It was horrifying to hear that. I'm so glad I couldn't see. It was black because there was so much smoke, but we could clearly hear them all around us, all around us. It felt like we were in hell.[53]

45.     Nouara abandoned the scooter he and his friend Damon tried to evacuate with on Front Street and tried to take shelter by the water in Lahaina Harbor. As with many other evacuees who got stuck on Front Street that day, at around 4:00 p.m. Nouara decided to jump into the harbor and swim to a jetty on the other side in an effort to avoid the burning hot wind and embers whipping through the harbor. Nouara and his friend Damon endured the hot winds and embers for hours as the boats in the harbor burned around them, until the Coast Guard rescued them later that evening a little after 6:00 pm.[54]

46.     At 6:18 p.m., Lahaina resident Chelsea Denton Fuqua recorded a video of other evacuees from Front Street who sought refuge from the firestorm on Front Street by jumping into the ocean. Dozens of strangers floated around her clinging to planks to stay afloat, dunking themselves into the waves to avoid catching fire.[55] Lahaina had become hell on Earth.

---

[53] Sabrina Tavernise, *How a Paradise Became a Death Trap*, N.Y. TIMES (Aug. 18, 2023), https://www.nytimes.com/2023/08/18/podcasts/the-daily/hawaii-deaths.html?showTranscript=1; *see also* Nicholas Bogel-Burroughs, Serge F. Kovaleski, Shawn Hubler and Riley Mellen, *How Fire Turned Lahaina Into a Death Trap*, N.Y. TIMES (Aug. 15, 2023), https://www.nytimes.com/2023/08/15/us/hawaii-maui-lahaina-fire.html.
[54] *Id.*
[55] *Id.*



### JURISDICTIONAL ALLEGATIONS

47.     This Court has jurisdiction over Defendants under Hawai'i Revised Statutes Section 634-35, because the causes of action arise as the result of Defendants' business transactions within the state, Defendants' commission of alleged tortious acts and injuries within this state, and Defendants' and Plaintiffs' use and possession of real property within this state. Defendants are subject to the jurisdiction of this Court because they reside and conduct business in this Circuit.

48.     This Court has subject matter jurisdiction over this matter pursuant to Hawai'i Revised Statutes Section 603-21.5 because, at all relevant times, Defendants conducted significant business within Maui County in the State of Hawai'i, rendering the exercise of jurisdiction over Defendants by Hawai'i consistent with the traditional notions of fair play and substantial justice. The amount in controversy exceeds the jurisdictional minimum of this Court.

49.     Venue is proper before this Court under Hawai'i Revised Statutes Section 603-36.

**PLAINTIFFS**

50.     Plaintiffs are individuals who, at all times relevant to this action, were homeowners, renters, business owners, residents, occupants, and visitors located in the area impacted by the Lahaina Fire, and/or who had property located therein.

51.     Specifically, Plaintiffs AINA KOHLER, JONATHAN VARONA, K1 VARONA, a minor by and through their Guardian ad Litem Aina Kohler, and K2 VARONA, a minor by and through their Guardian ad Litem Aina Kohler, are and were residents of the town of Lahaina, in the County of Maui, State of Hawai'i at all relevant times herein. Plaintiffs owned their residence located at 123 Wahikuli Road, Lahaina, Hawai'i 96761 that burned.

52.     LAHAINA SURF SHACK, LLC, a Hawai'i limited liability company, conducted business located at 117 Prison Street Lahaina, Hawai'i 96761 that burned.

53.     KEIKI BOWL, LLC, a Hawai'i limited liability company, conducted business located at 117 Prison Street Lahaina, Hawai'i 96761 that burned.

54.     Plaintiff REBECCA LAURICELLA is and was a resident of the town of Lahaina, in the County of Maui, State of Hawai'i at all relevant times herein. Plaintiff owned her residence located at 448 Front Street Lahaina, Hawai'i 96761 that burned.

55.     Plaintiffs MELE BINTLIFF, SCOTT BINTLIFF, and C. BINTLIFF, a minor by and through their Guardian ad Litem, Mele Bintliff, are and were residents of the town of Lahaina, in the County of Maui, State of Hawai'i at all relevant times herein. Plaintiffs owned their residence located at 165 Fleming Road, Lahaina, Hawai'i 96761 that suffered burn damage.

56.     Plaintiffs MICHAEL BECKER and SUSAN BECKER, individually and as Trustees of the Michael and Susan Becker Trust, are and were residents of the town of Lahaina,

in the County of Maui, State of Hawaiʻi at all relevant times herein. Plaintiffs owned their residence located at 1370 Front Street Lahaina, Hawaiʻi 96761 that burned.

57.     Plaintiffs EDWARD O'MARA, MIKEY MONTOYA, Z. O'MARA, a minor by and through their Guardian ad Litem, Edward O'Mara, and B. O'MARA, a minor by and through their Guardian ad Litem, Edward O'Mara, are and were residents of the town of Lahaina, in the County of Maui, State of Hawaiʻi at all relevant times herein, whose residence at 166 Wahikuli Road, Lahaina, Hawaiʻi 96761 burned.

## DEFENDANTS

58.     Defendant HAWAIIAN ELECTRIC INDUSTRIES, INC. (hereinafter "HEI"), is a corporation incorporated in Hawaiʻi, maintains its principal place of business in Hawaiʻi, and may be served with process by and through its registered agent: Kurt T. Murao at American Savings Bank Tower, Suite 2900, 1001 Bishop Street, Honolulu, Hawaiʻi 96813. At all relevant times herein, Defendant HEI provided electrical utility services to members of the public of Hawaiʻi, including Maui County, by and through its subsidiaries Hawaiʻi Electric Light Company, Inc. and Maui Electric Company, Ltd., as well as its principal subsidiary Hawaiian Electric Company, Inc.

59.     Defendant HAWAIIAN ELECTRIC COMPANY, INC. (hereinafter "HECO"), is a corporation incorporated in Hawaiʻi, maintains its principal place of business in Hawaiʻi, and may be served with process by and through its registered agent: Erin P. Kippen at 1001 Bishop Street American Savings Bank Tower, Suite 1100 Honolulu, Hawaiʻi 96813. At all relevant times herein, Defendant HECO provided electrical utility services to members of the public of

26

Hawai'i, including Maui County. At all relevant times herein, Defendant HECO was and is the principal subsidiary of HEI.

60.     Defendant MAUI ELECTRIC COMPANY, LIMITED (hereinafter "MECO") is a corporation incorporated in Hawai'i, maintains its principal place of business in Hawai'i, and may be served with process by and through its registered agent: Erin P. Kippen at 1001 Bishop Street American Savings Bank Tower, Suite 1100 Honolulu, Hawai'i 96813. At all relevant times herein, Defendant MECO provided electrical utility services to members of the public of Hawai'i, including Maui County. At all relevant times herein, Defendant MECO was and is a subsidiary of HEI and of HECO.

61.     Defendant HAWAI'I ELECTRIC LIGHT COMPANY, INC. (hereinafter "HELC") is a corporation incorporated in Hawai'i, maintains its principal place of business in Hawai'i, and may be served with process by and through its registered agent: Erin P. Kippen at 1001 Bishop Street American Savings Bank Tower, Suite 1100 Honolulu, Hawai'i 96813. At all relevant times herein, Defendant HELC provided electrical utility services to members of the public of Maui County, Hawai'i. At all relevant times herein, Defendant HELC was and is a subsidiary of HEI and of HECO.

62.     The term "HAWAIIAN ELECTRIC" used throughout this complaint refers collectively to HEI, HECO, MECO, and HELC. The term "Defendants" used throughout this complaint refers collectively to HAWAIIAN ELECTRIC and Does 1 through 100 and each of them. At all relevant times, each of the Defendants was the representative, agent, servant, employee, joint venturer, or alter ego of each of the remaining Defendants, and in doing the things alleged herein was at all times acting within the course and scope of said agency and

27

employment, and each Defendant has ratified and approved the acts of the remaining Defendants.

63.     Wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegation and reference shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

64.     HAWAIIAN ELECTRIC supply electricity throughout Hawaiʻi, including in Maui County. They own, design, construct, operate, maintain, and repair power lines and other equipment to transmit electricity to residents, businesses, schools, and industries in Hawaiʻi. HAWAIIAN ELECTRIC serve approximately 95 percent of Hawaiʻi's population and operate approximately 9,400 miles of transmission and distribution line across five islands.

65.     At all relevant times herein HAWAIIAN ELECTRIC are and were a public utility as defined by Hawaiʻi Revised Statutes Section 269-1.

66.     HAWAIIAN ELECTRIC are a for-profit, investor-owned utility company and at all relevant times herein, a corporation authorized to and doing business in Hawaiʻi.

67.     HAWAIIAN ELECTRIC are jointly and severally liable for each other's conduct pursuant to Hawaiʻi Revised Statutes section 663-10.9. HECO, HELC, and MECO are wholly owned, and entirely controlled, by HEI. HAWAIIAN ELECTRIC's officers and management are intertwined. Therefore, HAWAIIAN ELECTRIC are the agents, servants, employees, partners, aiders and abettors, co-conspirators, and joint venturers of each other.

68.     No assignment or transfer of the claim, or of any part thereof or interest therein, has been made.

## DOE DEFENDANTS

69.     The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants Does 1 through 100, inclusive, are unknown to Plaintiffs who sue said Defendants by such fictitious names pursuant to Hawai'i Rules of Civil Procedure, Rule 17. Plaintiffs further allege that each of said fictitious Defendants are in some manner responsible for the acts and occurrences hereinafter set forth. Plaintiffs will amend this Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible.

## GENERAL ALLEGATIONS

70.     Plaintiffs incorporate by reference each and every allegation contained above, as though fully set forth herein.

**A.     Defendants had a Non-Delegable, Non-Transferable Duty to Safely Maintain and Operate Their Electric Utility Infrastructure and Systems and Maintain Their Properties**

71.     At all times prior to August 8, 2023, Defendants had a non-delegable, non-transferable duty to properly construct, inspect, maintain, repair, manage and/or operate their electrical power lines, utility poles and appurtenant electrical equipment and to keep vegetation properly maintained as to prevent the foreseeable risk of fire.

72.     In the construction, inspection, repair, maintenance, ownership, and/or operation of their power lines, utility poles and other electrical equipment, Defendants had an obligation to comply with a number of statutes, regulations, orders and standards, as detailed below.

73.     HAWAIIAN ELECTRIC are required to comply with a number of design standards for their electrical equipment, specifically including, but not limited to Hawai'i

29

Revised Statutes Sections 269-6, 269-27.6, and Chapter 6-73, Hawai'i Administrative Rules,

"Installation, Operation, and Maintenance of Overhead and Underground Electrical Supply and

Communication Lines" (adopted 2007), Hawai'i State Public Utilities Commission (hereinafter

"Hawai'i PUC") General Order No. 6 and 7, National Electrical Code, NFPA No. 70 (2008),

National Electrical Safety Code (hereinafter "NESC"), American Standard Code for Electricity

Meters, ASA C-12, American Standard Requirements, Terminology and Test Code for

Instrument Transformers, ASA C57.13.

74.     Other jurisdictions also contemplate best practices and industry standards for grid

resiliency measures to ensure electrical equipment is designed and constructed to withstand high

winds.

75.     The California Public Utilities Commission's (hereinafter "CPUC") General

Order 95, Rules 43, 44, and 48 require that utility poles be constructed to withstand winds of up

to 92 miles per hour and even 113 miles per hour depending on the pole type and elevation.[56]

76.     Utility companies in Florida, the most hurricane-prone state in the nation, have

undertaken a process to replace power poles with hurricane-resistant poles that can withstand

winds of up to 145 miles per hour.[57] Florida Power & Light Company ("FPL") submitted to the

Florida Public Service Commission an application for approval of its Storm Hardening Plan,

wherein FPL updated its Distribution Engineering Reference Manual to include the

requirements of the NESC's Extreme Wind Loading criteria.[58] FPL proposed the following

hardening options: (1) storm guying, (2) equipment relocation, (3) intermediate pole

---

[56] Rules For Overhead Electric Line Construction, General Order No. 95, CAL. PUB. UTIL. COMM'N, https://ia.cpuc.ca.gov/gos/GO95/go_95_rule_43.html.
[57] Sarah Peters, *New FPL light poles in Gardens will withstand 145 mph winds*, THE PALM BEACH POST (July 21, 2016), https://www.palmbeachpost.com/story/news/local/2016/07/21/new-fpl-light-poles-in/6834739007/.
[58] *In re: Petition for approval of Florida Power & Light Company's 2019-2021 Storm Hardening Plan pursuant to Rule 25-6.0342, F.A.C.*, FLORIDA PUB. SERVICE COMM'N (Mar. 1, 2019), https://www.floridapsc.com/library/filings/2019/01303-2019/01303-2019.pdf.

installation, (4) upgrading pole class to increase the pole's wind rating, and (5) undergrounding electrical facilities.

77.     In their June 2022 proposal to the Hawai'i PUC aimed at committing funds for a Climate Adaptation Transmission and Distribution Resilience Program, HAWAIIAN ELECTRIC acknowledged Florida's example for grid hardening measures and the need to implement said measure in Hawai'i stating, "Florida provides an example of a state that suffered damage to its electrical system from hurricanes, but also illustrates how hardening investments can both reduce the level of damage to the system and improve recovery and restoration times. And Hurricane Lane in Hawai'i provides an example of an all too real and recent 'close-call' that demonstrates the threats are not a distant future issue and why critical resilience investments should not be delayed."[59]

78.     Upon information and belief, Plaintiffs allege that HAWAIIAN ELECTRIC failed to implement any storm hardening options, including but not limited to FPL's five aforementioned hardening measures.

79.     In a 2019 regulatory document HAWAIIAN ELECTRIC said it had fallen behind in replacing their old wooden power poles because of other priorities and warned of a "serious public hazard" if those poles failed.[60] HAWAIIAN ELECTRIC also stated that its poles were vulnerable because they were old and in a "severe wood decay hazard zone."[61]

---

[59] *Application of Hawaiian Electric Company, Inc., Hawai'i Electric Light Company, Inc., Maui Electric Company, Limited; Exhibits A through L; Verification; Docket No. 2022-0135*, Exhibit F, p. 3, HAWAI'I PUB. UTIL. COMM'N (June 30 2023), https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilienc e_EPRM_application.pdf.
[60] Jennifer McDermott, Bernard Condon, and Michael Biesecker, *Bare electrical wire and leaning poles on Maui were possible cause of deadly fires*, ABC News (Aug. 26, 2023), https://abcnews.go.com/Business/wireStory/bare-electrical-wire-poles-replacement-maui-match-strong-102584387.
[61] *Id.*

80.     Jennifer Potter, a former member of the Hawai'i PUC until last year, confirmed that many of Maui's wooden poles were in poor condition prior to her departure from the commission in 2022.[62]

81.     As part of their 2020 Test Year Rate Case, HAWAIIAN ELECTRIC provided responses to the Hawai'i PUC's Information Requests which included responding to the PUC's request to "provide the average age of poles and provide a summary of poles based on age group (i.e., 0 10 years, 11-20 years, etc.) and for each group identify what the wind speed rating is for the poles."[63] HAWAIIAN ELECTRIC's response was that over 29,852 (or 39%) of their poles were over the age of 51 years old as of January 1, 2019.[64] HAWAIIAN ELECTRIC also stated that those poles had a wind speed rating of 56 miles per hour.[65]

82.     For context, the International Association of Electrical Inspectors published an article about how to maintain and inspect wood poles and stated that "average [wood] pole life expectancy is around 45 years, but that varies based on location and related climatic factors."[66] Again, HAWAIIAN ELECTRIC stated that their poles were in a "severe wood decay hazard zone."[67]

83.     Further, Defendants must follow applicable vegetation management standards to protect the public from fire.

---

[62] *Id.*
[63] *Hawaiian Electric Responses to Information Requests,* Hawaiian Electric Company, Inc. 2020 Test Year Rate Case, Filing No. F-167505, Docket No. 2019-0085, at p.161, HAWAI'I PUB. UTIL. COMM'N (Dec. 18, 2019).
[64] *Id.*
[65] *Id.* at 162.
[66] Trevor Bowmer, PhD, *Maintaining and Inspecting Wood Poles: The 'Big Picture' and Practical Approaches,* IAEI Magazine (Jan. 2021), https://www.iaei.org/page/2021-01-Beyond-the-Service-Point-Wooden-Poles#:~:text=Average%20pole%20life%20expectancy%20is,the%20supply%20and%20communications%20facilit ies.
[67] *Supra* note 60.

84.     Defendants knew or reasonably should have known that such standards and regulations were minimum standards, and that Defendants have a duty to identify and manage the growth of vegetation near their utility poles and power lines that posed a foreseeable risk of igniting and starting a fire in the event of an electrical equipment failure.

85.     Certain Doe defendant owners of real property were aware of the fire risk associated with a lack of maintenance of invasive grasses on their property—grasses like buffelgrass and guinea grass native to Africa that are up to 10 times as dense as those commonly found on the mainland.[68] Said property owners failed to maintain vegetation in a reasonable and proper manner, which fueled the ignition and path of the destructive Lahaina Fire.

## B.    HAWAIIAN ELECTRIC Deliberately Designed, Constructed, Maintained, and Operated their Utility Infrastructure and Systems

86.     HAWAIIAN ELECTRIC designed their electrical facilities to transport electricity through their electrical grid to commercial, residential, and industrial customers. HAWAIIAN ELECTRIC's electrical facilities were a single, unified electrical circuit.

87.     HAWAIIAN ELECTRIC designed, constructed, operated, and maintained their electrical infrastructure to include system protection devices, such as relays, reclosers, circuit breakers, and sectionalizers, in a manner that would keep their power lines energized too long after a fault or interruption of power along their electric infrastructure.

88.     HAWAIIAN ELECTRIC designed, constructed, operated, and maintained their transmission and/or distribution power lines to have uninsulated, bare, and/or uncovered electrical conductor that posed an increased risk of faulting, arcing, sparking, and igniting fires

---

[68] Dan Frosch, Zusha Elinson, Jim Carlton, Christine Mai-Duc, *Everybody Knew the Invasive Grass of Maui Posed a Deadly Fire Threat, but Few Acted*, WALL ST. J. (Aug. 25, 2023), https://www.wsj.com/us-news/climate-environment/maui-fire-invasive-grass-cf6dbca2?st=ip3yhcvhhlftm5q&reflink=desktopwebshare_permalink.

generally should foreign objects come into contact with the conductor or multiple conductors come into contact with another.

89.     HAWAIIAN ELECTRIC designed, constructed, and maintained power poles that lacked storm hardening measures such as (1) storm guying, (2) equipment relocation, (3) intermediate pole installation, (4) upgrading pole class to increase the pole's wind rating, and (5) undergrounding electrical facilities.

90.     HAWAIIAN ELECTRIC failed to perform adequate intrusive pole inspections to ensure that their wood poles remained in good condition.

91.     HAWAIIAN ELECTRIC deliberately kept many wooden power poles in use well past their useful life, many of which exceeded 50 years old.

92.     HAWAIIAN ELECTRIC failed to replace wood power poles that were unstable, decaying, too old, and in need of replacement.

93.     HAWAIIAN ELECTRIC constructed power lines through poorly maintained areas with overgrown, dry vegetation.

94.     HAWAIIAN ELECTRIC designed, constructed, and operated their electrical infrastructure, including but not limited to reclosers, to reenergize too quickly after being de-energized. HAWAIIAN ELECTRIC could have configured the settings on their recloser devices to ensure longer times for faults to clear before reenergizing lines.

95.     HAWAIIAN ELECTRIC knew that deenergizing power lines is an effective mitigation measure to reduce the risk of harm in the event of severe weather events with high winds such as storms, cyclones, and hurricanes.

96.     HAWAIIAN ELECTRIC failed to develop, design, and implement a plan to de-energize electrical lines and electrical equipment in emergency situations including, but not limited to severe weather events with high winds such as storms, cyclones, and hurricanes.

97.     HAWAIIAN ELECTRIC Chief Operating Officer Shelee Kimura confirmed at an August 14, 2023, press conference that HAWAIIAN ELECTRIC did not and does not have a Public Safety Power Shutoff Program ("PSPS") to de-energize their power lines.[69] Kimura cited the risks of cutting power to people who rely on specialized medical equipment and the need for electricity to supply firefighters with water to combat fires as factors in HAWAIIAN ELECTRIC's decision not to de-energize power lines in West Maui.[70]

98.     Moreover, in a June 2022 proposal to the Hawai'i Public Utilities Commission aimed at committing funds for a Climate Adaptation Transmission and Distribution Resilience Program and recovering such funds from ratepayers in between their general rate cases, HAWAIIAN ELECTRIC stated "the driver for these resilience enhancements is to prevent the failure of critical assets in severe event scenarios, such as a major storm or hurricane."[71] HAWAIIAN ELECTRIC went on to explain opportunities for resilience enhancements specifically mentioning measures aimed at mitigating the consequences of damage and failures that do occur on HAWAIIAN ELECTRIC's equipment,

> The "bowtie method" . . . is increasingly used in the industry to leverage risk-threat assessments into a structured solution identification process. On the left side of the bowtie are preventive solutions intended to avoid or minimize failures and damage caused by severe events. On the right side of the bowtie are mitigation solutions, which are intended to reduce the impacts of failures and facilitate recovery to reduce the consequences of severe events. Mitigation measures can generally be thought of as addressing residual risks, filling any holes where preventive measures

---

[69] Michael Tsai, *HECO CEO: 'There are choices that need to be made'*, SPECTRUM NEWS HAWAII (Aug. 15, 2023), https://spectrumlocalnews.com/hi/hawaii/news/2023/08/15/heco-ceo---there-are-choices-that-need-to-be-made--.
[70] *Id.*
[71] *Supra* note 59.

fail, or to address short-term needs until longer-term preventive measures are implemented. **California's implementation of its Power Safety Shutoff (PSPS) Mitigation Plan is one such example of this, where PSPS events are used to mitigate wildfire risks until more robust preventive measures have been implemented in an area.**[72]

99.     Despite mentioning PSPS mitigation plans as a measure used to mitigate wildfire risk in their Hawaiʻi PUC application to raise rates for Hawaiians, HAWAIIAN ELECTRIC did not include any plans to deploy their own public safety power shut-off program.[73]

100.     In an August 23, 2023, interview with National Public Radio Michael Wara, a legal expert at Stanford Law School and a Senior Research Scholar at the Stanford Woods Institute for the Environment stated the following regarding HAWAIIAN ELECTRIC's failure to have a PSPS program: "It's my opinion that any utility with wildfire risk in their service territory needs to have a public safety power shut-off program, and, like, they need to have a plan. And a failure to plan is a plan to fail."[74]

101.     HAWAIIAN ELECTRIC stated in an August 27, 2023, press release,

The records conclusively establish that Hawaiian Electric power lines to Lahaina were not energized when the Afternoon Fire broke out shortly before 3 p.m. on Aug. 8, in a field near Lahaina Intermediate School. Power had been out for more than six hours by that time. There was no electricity flowing through the wires in the area or anywhere else on the West Maui coast. Hawaiian Electric has informed ATF investigators of the availability of records that demonstrate these facts.[75]

HAWAIIAN ELECTRIC's press release does not conclusively establish that they de-energized their power lines in Lahaina prior to the 6:30 a.m. ignition of the Lahaina Fire nor does it

---

[72] *Id.* at p. 3–4 (emphasis added).

[73] *Id.*

[74] Greg Allen, *Hawaiian Electric saw the need to better prepare for fires, but never prioritized it,* NAT'L PUB. RADIO (Aug. 23, 2023), https://www.npr.org/2023/08/23/1195505951/hawaiian-electric-saw-the-need-to-better-prepare-for-fires-but-never-prioritized.

[75] *Supra* note 10 at p.2.

establish that HAWAIIAN ELECTRIC executed a planned, preemptive Public Safety Power Shutoff.

102.    Inexplicably, HAWAIIAN ELECTRIC's concerns about needing electricity to provide power to people with specialized medical equipment and firefighters with pumped water to combat the flames were overridden once they discovered that their power lines ignited the Lahaina Fire. HAWAIIAN ELECTRIC's utility company doublespeak cannot hide the fact that they failed to preemptively and deliberately de-energize their power lines in Lahaina *after* they knew of the Olinda and Kula Fire ignitions as well as power outages and downed poles throughout West Maui, *before* the Lahaina Fire's ignition.

**C.    Defendants Knew About the Elevated Fire Risk Existing on Maui Before the Lahaina Fire and Yet Failed to Take Sufficient Preventative Actions to Mitigate Risk**

103.    HAWAIIAN ELECTRIC knew and acknowledged the risk of hurricanes damaging their electrical facilities stating "Hurricane Lane in Hawai'i provides an example of an all too real and recent 'close-call' that demonstrates the threats are not a distant future issue and why critical resilience investments should not be delayed."[76]

104.    Nevertheless, HAWAIIAN ELECTRIC failed to implement storm hardening measures to prevent or even mitigate the risk of catastrophic failure of their electrical equipment in the event of a severe weather event such as a tropical cyclone or hurricane.

105.    According to the National Oceanic and Atmospheric Administration (hereinafter "NOAA") during a normal season, four or five tropical cyclones move through the central Pacific Ocean each year.  NOAA's Director of the Central Pacific Hurricane Center stated, "Throughout the state of Hawaii, we must take note that the possibility of a hurricane in these

---

[76] *Supra* note 59.

islands is real. Heed the advice of public safety officials. Make a preparedness plan, and communicate it to your friends and family. Together, we can make our communities more weather ready and resilient."

106. Defendants knew about the significant risk of wildfires in West Maui years before the Lahaina Fire began:

(a) The 2018 West Maui Fires burned 21 houses, 27 cars, and more than 2,100 acres, causing $4.3 million in damages.[77] Fire ignited uphill from Lahaina in the Kauaʻula Valley around 11:00 p.m. on August 24, 2018, driven by high winds generated from Hurricane Lane.

(b) Researchers who studied the aftermath of Hurricane Lane documented the number of ignitions occurring on August 24, 2018, in Lahaina, showing a spike in ignitions when the red flag threshold was met under similar but less severe weather conditions than those that occurred in Lahaina on August 8, 2023.[78]

---

[77] Brianna Sacks and Justine McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat.*, WASH. POST (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.
[78] *See* Alison D. Nugent, et al., *Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi*, 101 BULL. AM. METEOROL. SOC'Y E959–61, (2020), available at https://doi.org/10.1175/BAMS-D-19-0104.1.



(c)     At a town hall addressing the recent fires on August 29, 2018, West Maui

residents asked state and county officials why HAWAIIAN ELECTRIC did not

shut off power given the high winds, low humidity, and drought conditions.[79]

(d)     Defendants knew or reasonably should have known of the history of previous

fires in the Lahaina area including a September 18, 2017, brush fire which erupted

in a vacant lot above the Lahaina High School Football field, just north of

Defendants' Lahaina Substation on Lahainaluna Road.[80]

(e)     The Olinda, Kula, and Pulehu/Kihei Fires, some or all of which ignited in the

hours before the Lahaina Fire on August 7th and August 8th, put HAWAIIAN

---

[79] *Supra* note 77.
[80] *Another Maui Fire Breaks Out, This Time Near Lahainaluna High School*, HAWAI'I WILDFIRE MANAGEMENT
ORGANIZATION (Sept. 19, 2017), https://www.hawaiiwildfire.org/news-center/brush-fire-2-acres-near-lahainaluna-
hs; *see also Brush Fire Scorches 2 Acres near Lahainaluna HS*, MAUI NOW (Sept. 19, 2017),
https://mauinow.com/2017/09/19/brush-fire-scorches-2-acres-near-lahainaluna-hs/.

ELECTRIC on notice that their equipment had likely started fires elsewhere on

Maui in the hours preceding the Lahaina Fire.[81]

(f)    Power outages and grid stress were already present on HAWAIIAN ELECTRIC's

electrical circuits in Lahaina the night before and the morning of the Lahaina

Fire.[82]

107.    Certain Doe defendant owners of real property were also aware of the fire risk

associated with a lack of maintenance of invasive grasses on their property—and said property

owners failed to maintain vegetation in a reasonable and proper manner, which fueled the

ignition and path of the destructive Lahaina Fire.

**D.    Defendants' Actions and Inactions Led to the Ignition of the Lahaina Fire**

108.    HAWAIIAN ELECTRIC's failure to de-energize their power lines in Lahaina and

West Maui on August 8, 2023, at a time when West Maui faced drought conditions and wind

gusts brought on by Hurricane Dora had already hit 58 miles per hour on the island of Maui on

August 7th and would later hit 82 miles per hour on both the islands of Oahu and Hawaii[83] was

inexcusable and a substantial cause of the Lahaina Fire.

109.    HAWAIIAN ELECTRIC's failure to design, construct, and install hurricane-

resistant power poles despite knowledge that such poles would strengthen the resiliency of their

electrical infrastructure in the event of severe weather events such as tropical cyclones and

hurricanes was inexcusable and a substantial cause of the Lahaina Fire. HAWAIIAN

ELECTRIC stated that 30 of their power poles were down and multiple spans of power lines in

---

[81] *8/17 COUNTY OF MAUI WILDFIRE DISASTER UPDATE AS OF 9:15 P.M.*, CNTY. OF MAUI (Aug. 17, 2023), https://www.mauicounty.gov/CivicAlerts.aspx?AID=12724.
[82] *Supra* note 20.
[83] *Supra* note 18.

several areas—including on Honoapiʻilani Highway—on the day of the Lahaina Fire.[84]

HAWAIIAN ELECTRIC's downed power poles and power lines blocked evacuation routes out

of Lahaina on the day of the Lahaina Fire, forcing evacuees to flee on a limited number of

streets, which caused severe congestion and in some cases stand still traffic blockages—

including on Front Street in Lahaina.

110.    As of November 27, 2022, HAWAIIAN ELECTRIC devoted $155 million to

shareholder dividends, $30 million to an initiative called "HC Expense", but only $15 million to

"investments in utility". HAWAIIAN ELECTRIC's decision to prioritize issuing the majority of

their capital to shareholders in the forms of dividends and under-invest in the hardening their

electrical grid and wildfire prevention measures was a substantial cause of the Lahaina Fire.[85]



---

[84] Kiana Kalahele, *More than 30 downed power poles reported on Maui; thousands without power*, HAWAII NEWS NOW (Aug. 8, 2023), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands-statewide/.

[85] *3Q22 Financial Results*, HAWAIIAN ELEC. INDUS., INC., p. 15 (Nov. 7, 2022), https://s2.q4cdn.com/268623243/files/doc_financials/2022/q3/HEI-3Q22-Earnings-Presentation.pdf.

111.    Certain Doe defendant owners of real property failed to maintain vegetation in a reasonable and proper manner, which fueled the ignition and path of the destructive Lahaina Fire.

**E.    Defendants' Actions and Inactions Caused Plaintiffs Harm**

112.    The negligence of Defendants, and each of them, was a substantial factor in causing the Plaintiffs' damages.

113.    Defendants' failure to comply with their duties of care proximately caused damage to Plaintiffs.

114.    As a direct, proximate, and legal result of said negligence Plaintiffs suffered economic and non-economic damages, including but not limited to property damage, loss of homes, loss of structures, personal property, loss of cherished possessions, physical injury, emotional distress, annoyance, disturbance, inconvenience, and mental anguish, loss of quiet enjoyment of their property, and costs related to Plaintiffs' evacuation and/or relocation. Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their safety and rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. The conduct of the defendants evidences a conscious disregard for the safety of others, including Plaintiffs. The Defendants' conduct was and is despicable conduct and constitutes malice as defined by the Supreme Court of Hawai'i in *Awakuni v. Awana*, 115 Hawai'i 126, 141 (2007). An officer, director, or managing agent of Defendants personally committed, authorized and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants, and each of them.

115.    Plaintiffs suffered damages, which were clearly and certainly caused by the

Lahaina Fire, resulting in loss of human life, severe personal injuries, evacuations, relocations,

the cost to repair their damaged and/or destroyed real and personal property.

## COUNT 1

### NEGLIGENCE

### (Against All Defendants and Each of Them)

116.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as

though fully set forth herein.

117.    Defendants and DOES 1-100, have a non-delegable duty to exercise proper and due

care in the maintenance, use, operation, repair and inspection of their power lines, utilities, and the

areas surrounding those areas.

118.    Defendants and DOES 1-100, have a non-delegable duty to maintain the integrity

of their utilities and the property and vegetation surrounding such utilities, including a duty to

apply a level of care commensurate with and proportionate to the danger of designing, engineering,

constructing, operating, and maintaining electrical transmission and distribution systems, and

surrounding vegetation, especially those in fire risk areas.

119.    Defendants and DOES 1-100 have a non-delegable duty of vigilant oversight in

the maintenance, use, operation, repair, and inspection appropriate to the changing conditions

and circumstances of their electrical transmission and distribution systems and surrounding

vegetation.

120.    Prior to the Lahaina Fire, Defendants hired, retained, contracted, allowed, and/or

collaborated with vegetation management companies, including DOE Defendants, to perform

clearance and vegetation management work along their power lines and power equipment.  This

work involved a risk of fire if performed below-standard, and such risk was an inherent factor in the nature of the agency relationship.  A reasonable property or easement owner or lessee in the position of Defendants knew or should have known the necessity of taking special precautions to protect adjoining property owners against the risk of harm created by work performed, work to be performed and/or work otherwise not performed.

121.   A reasonable utility company, property owner, easement owner, or lessee in the position of Defendants knew or should have known or recognized the necessity of taking special precautions to protect nearby property owners and the community at large against the risk of harm created by work performed, work to be performed, and/or work otherwise not performed relative to their equipment.

122.   Defendants and DOES 1-100, at all relevant times, had and have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair, and maintenance of their electrical lines, equipment, infrastructure, and the vegetation surrounding the same.

123.   Defendants and DOES 1-100 failed to take reasonable precautions to protect nearby property and the public at large against the foreseeable risk of harm created by their actions and non-actions.

124.   Defendants and DOES 1-100 breached their duties to exercise care in the maintenance, use, operation, repair and inspection of their power lines, electrical equipment, utilities, and the areas surrounding it in manners including but not limited to the following:

(a)      Failure to develop, design, and implement a plan to de-energize electrical lines and electrical equipment in emergency situations including, but not limited to severe weather events with high winds such as storms, cyclones, and hurricanes.

44

(b)      Failure to perform inspections and maintenance of high-powered electrical lines and electrical equipment in a timely and routine manner;

(b)      Failing to design, construct, monitor, and maintain their electrical lines and equipment in a manner that considered known and foreseeable conditions, including the dangers of wildfire igniting in regions known for dry combustible vegetation;

(c)      Knowingly allowing lines, equipment, and vegetation to devolve into dangerous conditions by refusing to allocate the necessary funding to inspect, repair, and maintain high powered lines, equipment, and surrounding vegetation;

(d)      Knowingly keeping high powered electrical lines, equipment, and infrastructure in disrepair;

(e)      Maintaining sub-standard safety practices despite criticisms from regulatory agencies including the Hawai'i PUC;

(f)      Failure to consider and remedy the dangers of sparking, arcing, and downed power lines in high fire risk regions such as Maui County, and West Maui in particular;

(g)      Failure to keep electrical equipment in reasonably safe condition at all times;

(h)      Failure to implement and heed regulations and direction from regulatory agencies;

(i)      Failure to comply with Federal law, Federal regulation, Hawai'i law, Hawai'i regulation, and industry standards in maintaining and repairing public utility equipment, including but not limited to high powered electric equipment and surrounding vegetation;

(j)      Failure to maintain and implement reasonable vegetation management programs to ensure dry vegetation is cleared/cut and a safe distance away from high

45

powered equipment.

(k)      Failure to implement any storm hardening measures, including but not limited to (1) storm guying, (2) equipment relocation, (3) intermediate pole installation, (4) upgrading pole class to increase the pole's wind rating, and (5) undergrounding electrical facilities.

125.    At all times mentioned herein, Defendants and DOES 1 to 100, and each of them, failed to properly inspect and maintain their electrical and utility line(s) and equipment which they knew, given the then existing drought and/or dry conditions, posed a risk of fire and resulting serious injury, damage or death to others, including Plaintiffs and their property. Defendants and DOES 1 - 100, and each of them, were aware and/or should have been aware that if the subject line and/or subject equipment came in contact with known dry vegetation in the Maui County region, that a wildfire would likely result. Defendants, and each of them, also knew that, given the existing dry conditions, said wildfire was likely to pose a risk of serious injury, damage, and/or death to the general public and their property, including the named Plaintiffs here.

126.    The wildfire alleged herein was a direct, legal, and proximate result of the negligence of Defendants and DOES 1-100, and each of them.

127.    Defendants and DOES 1-100 and each of them, negligently installed, constructed, maintained, operated, inspected, and/or repaired their power lines, electrical equipment, and surrounding vegetation and as a direct, proximate, and legal result of said negligence, caused Hawai'i's deadliest wildfire in history and Plaintiffs' damages.

128.    The negligence of Defendants was a substantial factor in causing Plaintiffs' damages.

129.    As a direct, proximate, and legal result of said negligence Plaintiffs suffered economic and non-economic damages, including, but not limited to property damage, loss of homes, loss of structures, personal property, loss of cherished possessions, physical injury, emotional distress, annoyance, disturbance, inconvenience, and mental anguish, loss of quiet enjoyment of their property, and costs related to Plaintiffs' evacuation and/or relocation.

130.    Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their safety and rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. The conduct of the defendants evidences a conscious disregard for the safety of others, including Plaintiffs. The Defendants' conduct was and is despicable conduct and constitutes malice as defined by the Supreme Court of Hawai'i in *Awakuni v. Awana*, 115 Hawai'i 126, 141 (2007). An officer, director, or managing agent of Defendants personally committed, authorized and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants, and each of them.

## COUNT II

### GROSS NEGLIGENCE

#### (Against All Defendants and Each of Them)

131.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

132.    Defendants and each of them knew of the extreme fire danger the high winds created for their overhead electrical infrastructure, particularly during Red Flag conditions. The risks included, without limitation, winds that could down power poles and power lines, ignite

47

vegetation, and cause a wildfire that would spread rapidly. And Certain Doe defendant owners of real property knew of the risk associated with a lack of maintenance of invasive grasses on their property, and failed to maintain vegetation in a reasonable and proper manner, which fueled the ignition and path of the destructive Lahaina Fire.

133.   Despite their knowledge of the extreme risks of wildfires, Defendants chose not to de-energize their power lines and/or property maintain their vegetation during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Lahaina Fire.

134.   Defendants also failed to de-energize their lines during and after the Lahaina Fire.

135.   Even after they had knowledge of downed power poles and power lines in vegetation and on the ground, Defendants still chose to not de-energize their power lines.

136.   Accordingly, Defendants acted with substantial indifference to the probable consequences of their acts and omissions.

137.   Although Defendants had knowledge of the risks of high winds and wildfires in general, a High Wind Watch, a Red Flag Warning, notices from their own monitoring system that their power lines were experiencing issues in the days leading up to the Lahaina Fire, and specific warnings that high winds could blow down power poles and that fires would spread rapidly if ignited, Defendants did nothing.

138.   Defendants' gross negligence proximately caused the injuries that Plaintiffs suffered.

139.   Plaintiffs also seek damages according to proof at trial, as set forth in the Prayer for Relief below.

140.   In addition, Plaintiffs are entitled to punitive damages for Defendants reckless, wanton, and conscious indifference to their health, safety, life, and property in causing the Lahaina Fire.

## COUNT III

## ULTRAHAZARDOUS ACTIVITY

## (Against HAWAIIAN ELECTRIC Defendants and DOES 1-50)

141.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

142.   Defendants carried on an abnormally dangerous activity by maintaining power in their power lines during a High Wind Watch and Red Flag Warning that specifically cautioned that high winds could down power poles and power lines, and that any fire that started would likely spread rapidly.

143.   Defendants owed a heightened duty of care to the public, including without limitation Plaintiffs.  This heightened duty required Defendants to exercise the highest possible degree of skill, care, caution, diligence, and foresight in providing power in their power lines during a High Wind Watch and Red Flag Warning.

144.   Providing power in their power lines during a High Wind Watch and Red Flag Warning, during which the NWS warned that power poles were at risk of being blown down by strong winds and in which any fire that started would spread rapidly, is an abnormally dangerous activity, subjecting Defendants to strict liability.

145.   The risk of harm to the public, including without limitation Plaintiffs, was very high given the high winds and drought conditions.

146. The likelihood that providing power to the power lines during a High Wind Watch and Red Flag Warning would result in power lines blowing down and causing live power lines to come in contact with vegetation was high.

147. Defendants could not eliminate the risk associated with providing power to their power lines during a High Wind Watch or Red Flag Warning, and also engage in this abnormally dangerous activity.

148. The practice of deenergizing power lines during fire weather conditions is commonplace in the Western United States. Defendants maintained power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning in a manner outside common usage.

149. Maintaining power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning was inappropriate on Maui, given the drought conditions and high fire risk weather forecast.

150. Nothing about maintaining the power in Defendants' power lines outweighs the dangerous risk of keeping the electrical infrastructure energized, given the High Wind Watch and Red Flag Warning.

151. As set forth above, Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, subjecting Defendants to awards of punitive damages.

152. As a further direct and proximate result of Defendants' conduct, Plaintiffs incurred significant and actual damages, as described herein and in an amount to be proven at trial.

## COUNT IV

### TRESPASS

### (Against All Defendants and Each of Them)

153.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

154.     At all times relevant herein, Plaintiffs were the owners and lawful occupiers of property damaged by the fire alleged herein.

155.     Defendants' actions caused the Lahaina Fire and allowed it to ignite and/or spread out of control, causing injury to Plaintiffs' property.

156.     Plaintiffs did not grant permission for Defendants to cause the Lahaina Fire to enter their properties.

157.     As a direct, proximate, and substantial cause of the trespass, Plaintiffs have suffered and will continue to suffer damages, including but not limited to damage to property, discomfort, annoyance, and emotional distress in an amount to be proved at the time of trial.

158.     As a further direct and proximate result of the conduct of Defendants, Plaintiffs have hired and retained counsel to recover compensation for loss and damage and are entitled to recover all attorney's fees, expert fees, consultant fees, and litigation costs and expenses, pursuant to the Court's inherent and equitable powers to award attorneys' fees.

159.     Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their safety and rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. The conduct of the defendants evidences a conscious disregard for the safety of others, including Plaintiffs. The Defendants' conduct was and is

51

despicable conduct and constitutes malice as defined by the Supreme Court of Hawai'i in *Awakuni v. Awana*, 115 Hawai'i 126, 141 (2007).  An officer, director, or managing agent of Defendants personally committed, authorized and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants, and each of them.

**COUNT V**

**PREMISES LIABILITY**

**(Against All Defendants and Each of Them)**

160.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

161.    Defendants were the owners of an easement and/or real property in the area of the Lahaina Fire, and/or were the owners of electrical infrastructure upon said easement and/or right of way.

162.    Defendants, including certain Doe real property owners, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control the vegetation near their electrical infrastructure along the real property and easement, allowing an unsafe condition presenting a foreseeable risk of fire danger to exist in said area.

163.    As a direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs suffered, and continue to suffer, the injuries and damages as set forth above.

164.    As a further direct and legal result of the wrongful acts and/or omissions of Defendants, Plaintiffs seek the recovery of punitive and exemplary damages against Defendants as set forth above.

## COUNT VI

### PRIVATE NUISANCE

### (Against All Defendants and Each of Them)

165.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

166.   Defendants', including certain Doe real property owners', actions, conduct, omissions, negligence, trespass and failure to act resulted in a fire hazard and a foreseeable obstruction to the free use of Plaintiffs property, invaded the right to use the Plaintiffs' property, and interfered with the enjoyment of Plaintiffs' property, causing the Plaintiffs unreasonable harm and substantial actual damages constituting a nuisance.

167.   As a direct and proximate result of the conduct of Defendants, Plaintiffs sustained loss and damage, including but not limited to damage to property, discomfort, annoyance, and emotional distress, the amount of which will be proven at trial.

168.   Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their safety and rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. The conduct of the defendants evidences a conscious disregard for the safety of others, including Plaintiffs. The Defendants' conduct was and is despicable conduct and constitutes malice as defined by the Supreme Court of Hawai'i in *Awakuni v. Awana*, 115 Hawai'i 126, 141 (2007). An officer, director, or managing agent of Defendants personally committed, authorized and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants, and each of them.

53

## COUNT VII

### PUBLIC NUISANCE

### (Against All Defendants and Each of Them)

169.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

170.    Plaintiffs own and/or occupy property at or near the site of the fire which is the subject of this action.  At all relevant times herein, Plaintiffs had a right to occupy, enjoy, and use their property without interference by Defendants and DOES 1 to 100.

171.    Defendants, and each of them, owed a duty to the public, including Plaintiffs, to conduct their business, including their maintenance and/or operation of power lines, power poles, and electrical equipment and the adjacent vegetation in Maui County in a manner that did not threaten, harm, injure, or interfere with the public welfare from their operation of said equipment.

172.    Defendants, including certain Doe real property owners, and each of them, by acting or failing to act, created a condition which was harmful to the health and safety of the public, including Plaintiffs, and interfered with the comfortable occupancy, use, and enjoyment of Plaintiffs' property.  Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of Defendants, and each of them, in acting in the foregoing manner.

173.    The hazardous condition which was created by or permitted to exist by Defendants, and each of them, affected a substantial number of people within the general public, including Plaintiffs, and constituted a public nuisance.  Additionally, uncontrolled wildfire constituted a public nuisance.

174.    The damaging effects of Defendants' maintenance of a fire hazard and the ensuing wildfire are ongoing and affect the public at large.  As a result of the fire's location, temperature, and duration, extensive areas of hydrophobic soils developed within the fire's perimeter, may cause post-fire runoff hazards to occur, including, but not limited to, hillside erosion, complete mudslides, debris flow hazards, and sediment laden flow hazards.

175.    As a direct and legal result of the conduct of Defendants, and each of them, Plaintiffs suffered harm that is different from the type of harm suffered by the general public. Specifically, Plaintiffs have lost the occupancy, possession, use, and enjoyment of their real and personal property, including, but not limited to, a reasonable and rational fear that the area is still dangerous, a diminution in the fair market value of their property, an impairment of the salability of their property, hydrophobic soils, exposure to toxic substances, the presence of special waste requiring special management and disposal, and lingering smells and fumes of smoke, soot, ash, and dust.

176.    As a further direct and legal result of the conduct of Defendants, and each of them, Plaintiffs have suffered and will continue to suffer discomfort, anxiety, fear, worries, annoyance, and stress related to the interference with Plaintiffs' occupancy, possession, use, and enjoyment of their property as alleged herein.

177.    A reasonable, ordinary person would be annoyed and disturbed by the conditions created by Defendants, and each of them, and the resulting fire.

178.    The conduct of Defendants, and each of them, was and is unreasonable, and the seriousness of the harm to the public, including Plaintiffs, outweighs the social utility of Defendants' conduct.

179. The individual and collective conduct of Defendants, and each of them, resulting in the Lahaina Fire is not an isolated incident, but is part of an ongoing and repeated course of conduct by Defendants.

180. The unreasonable conduct of Defendants, and each of them, is a direct and legal cause of the harm, injury, and damage to the public, including Plaintiffs.

181. Defendants, and each of them, have individually and collectively failed and refused to conduct proper inspections and maintenance of vegetation and electrical equipment in order to ensure the safe delivery of electricity to residents through their high voltage power lines. Defendants' individual and collective failure to do so has exposed every member of the public, including residents of Maui County, to a foreseeable danger of personal injury, death, and loss of or destruction of real and personal property.

182. The conduct of Defendants, and each of them, set forth herein constitutes a public nuisance.

183. Plaintiffs have standing to maintain an action for public nuisance because the nuisance is especially injurious to Plaintiffs as described herein.

184. Defendants' conduct is injurious and offensive to the senses of Plaintiffs, unreasonably interferes with the comfortable enjoyment of their properties, and unlawfully obstructs the free use, in the customary manner, of Plaintiffs' properties, causing harm, injury, and damages.

185. For these reasons, Plaintiffs seek a permanent injunction ordering Defendants to abate the existing and continuing nuisance described herein, including without limitation requiring Defendants insulate their electric conductor wires, underground their electric wires, harden their utility poles against hurricanes, cut and maintain their vegetation, and develop and

56

implement a Public Safety Power Shutoff Plan to de-energize electric equipment during severe weather events.

186.    Further, the conduct alleged against Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their safety and rights, constituting oppression, for which Defendants must be punished by punitive and exemplary damages in an amount according to proof. The conduct of the defendants evidences a conscious disregard for the safety of others, including Plaintiffs. The Defendants' conduct was and is despicable conduct and constitutes malice as defined by the Supreme Court of Hawai'i in *Awakuni v. Awana*, 115 Hawai'i 126, 141 (2007).  An officer, director, or managing agent of Defendants personally committed, authorized and/or ratified the despicable and wrongful conduct alleged in this complaint. Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of these Defendants, and each of them.

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants and DOES 1 through 100, and each of them, as follows:

1.  General and/or special damages, according to proof;

2.  Repair, depreciation, and/or replacement of damage, destroyed, and/or lost personal and/or real property, including but not limited to trees, landscaping, and foliage;

3.  Loss of use, additional living expenses, benefit, goodwill, and enjoyment of Plaintiffs' real and/or personal property;

4.  Loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses;

5. Past and future medical expenses and incidental expenses according to proof at trial;

6. Attorneys' fees, expert fees, consultant fees, and litigation costs and expenses, as allowed and/or pursuant to the Court's inherent and equitable powers to award attorneys' fees;

7. All applicable general damages, including but not limited to those for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, and personal injury;

8. Special damages;

9. Past and future damages;

10. Statutory damages;

11. Punitive/exemplary damages;

12. All costs of suit;

13. Prejudgment interest, according to proof;

14. Injunctive relief ordering that Defendants to abate the existing and continuing nuisance described herein, including without limitation requiring Defendants insulate their electric conductor wires, underground their electric wires, harden their utility poles against hurricanes, cut and maintain their vegetation, and develop and implement a Public Safety Power Shutoff Plan to de-energize electric equipment during severe weather events.

15. Such other and further relief as the Court shall deem proper, all according to proof.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully hereby demand a jury trial.


DATED: August 29, 2023                    STUEMKE LAW FIRM PLLC

                                          By: /s/ Jay E. Stuemke
                                          JAY E. STUEMKE, ESQ.
                                          Attorney for Plaintiffs

DATED: August 29, 2023                    BRIDGFORD, GLEASON & ARTINIAN

                                          By: /s/ Richard K. Bridgford
                                          RICHARD K. BRIDGFORD, ESQ.
                                          MICHAEL H. ARTINIAN, ESQ.
                                          BRIAN E. SUTTER, ESQ.
                                          ALLAN L. BRIDGFORD, ESQ.
                                          TALIA R. EDRI, Esq.
                                          Attorneys for Plaintiffs

| **STATE OF HAWAIʻI**<br>CIRCUIT COURT OF THE<br>SECOND   CIRCUIT | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | |
|---|---|---|
| CASE NUMBER | | |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

STUEMKE LAW FIRM PLLC                    Telephone: (808) 460-3161
Jay E. Stuemke, Esq. (HI SBN 011696)      Email: jay@stuemkelaw.com
142 Kuailima Drive, Suite A
Kailua, HI 96734
Attorneys for Plaintiffs

| PLAINTIFF | VS. | DEFENDANT(S) |
|---|---|---|
| AINA KOHLER, et al. | | HAWAIIAN ELECTRIC INDUSTRIES, INC., a Hawaiʻi corporation; HAWAIIAN ELECTRIC COMPANY, INC., a Hawaiʻi corporation, HAWAIʻI ELECTRIC LIGHT COMPANY, INC., a Hawaiʻi corporation; MAUI ELECTRIC COMPANY, LIMITED, a Hawaiʻi corporation; and DOES 1 through 100, inclusive |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

Jay E. Stuemke, Esq./STUEMKE LAW FIRM PLLC
142 Kuailima Drive, Suite A
Kailua, HI 96734

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED | CLERK | CIRCUIT COURT CLERK |
|---|---|---|
| | | |

The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us



In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402; MAUI- Phone No. 808-244-2929, FAX 808-244-2777; HAWAII- Phone No. 808-961-7424, TTY 808-961-7422, FAX 808-961-7411; KAUAI- Phone No. 808-482-2365, TTY 808-482-2533, FAX 808-482-2509, at least ten (10) working days prior to your hearing or appointment date.